OPINION
David Lee Myers appeals from the judgment of the Greene County Common Pleas Court wherein the court refused to vacate his conviction for a capital offense.
The facts underlying Myers' conviction are set out in detail in this court's opinion which affirmed Myers' conviction. See, State v. Myers (February 12, 1999), Greene App. 96-CA-38, unreported. Myers filed his petition pursuant to R.C. 2953.21 on September 17, 1999 and two amended petitions on September 27, 1999 and November 17, 1999. The trial court granted the State's motion for summary judgment on March 16, 2000. This appeal followed.
Myers raises five assignments of error. He contends in his first four assignments of error that the trial court erred in granting the State summary judgment on his claims without issuing sufficient findings of fact and conclusions of law, without providing him an evidentiary hearing, and by applying the bar of res judicata to his claims. In his fifth assignment of error, Myers also claims that Ohio's post-conviction relief process is not adequate because it does not allow for adequate discovery and for expert witness assistance. In order to address appellant's first four assignments, we must review the trial court's resolution of Myers' petition which contained thirty-six claims for relief.
In his first claim for relief, Myers contended that his conviction should be set aside because his trial counsel's performance was deficient in that he failed to adequately prepare for Myers' trial.
In support of his petition, Myers submitted the affidavit of his trial counsel William Summers. Summers stated he was hired by Myers just prior to the initial trial date in July 1994. He stated the trial court granted Myers a continuance until October 11, 1994 and then again continued several more times because Summers was tied up in the "Dublin Securities" case in Franklin County Common Pleas Court. Summers stated the Dublin Securities case started in July 1995 and concluded on December 14, 1995 leaving him only eighteen days to prepare for Myers' trial date of January 2, 1996.
The following additional paragraphs from Summers' affidavit are particularly pertinent to the claim of ineffective assistance of counsel.
 15. As noted, in the twelve months immediately prior to the trial in this matter I had virtually no time to prepare for this trial. I was in trial in the Franklin County Common Pleas Court from July through December 1995. In the three (3) months immediately preceding the trial in Columbus I was entirely consumed with extensive motions hearings in that case before Judges Cox (the original visiting trial judge) and Judge Ammer. In late 1994 and the early part of 1995, I also was deeply involved in another capital murder case in Russell, Kentucky and was frequently out of the state working on that case. That indictment was known as Commonwealth of Kentucky v. Robert McMahon, Russell County Kentucky Circuit Court case number 94-CR-007, before the Honorable Ron Johnson. That matter began trial in February 1995 with a change of venue motion being granted to the opposite side of Kentucky. A very reasonable plea offer was made after two weeks of trial in February 1995 when the Commonwealth was caught in a clear Massiah violation.
 16. After I was retained for Mr. Myers, no other lawyer really worked on this case until very shortly before it's trial. Because I was virtually unavailable due to the other cases I have mentioned, my paralegal, Christine Watson, was responsible for virtually all case preparation, contacts with investigators and dealings with possible or retained experts. Indeed, much of the correspondence to and from the prosecutors was written and signed by or addressed to my paralegal. While I was in trial in Columbus, necessity required that Christine for the most part be in charge of the case. It was all I could do.
 17. The trial in this case began on January 2, 1996. I had just (December 14, 1995), finished the six (6) month long Dublin Securities fraud trial in Columbus, Ohio. Accordingly, if I took no time off to rest or see my family (I live in Cleveland, Ohio) or spend any time with them during the Christmas holiday, I had only a mere eighteen days to prepare.
 18. In fact, by the conclusion of the trial in Columbus, I was physically and mentally exhausted. The trial had been extremely contentious and involved complex securities laws, literally thousands of exhibits and scores of witnesses. Although I did not know it at the time, I was becoming very ill. By the middle of the Myers trial, I had become extremely ill, suffering from infections of my respiratory system, causing Pneumonia. At times throughout the trial, testimony had to stop while I coughed. Immediately following the verdict in the Myers case, two days in fact, I was hospitalized with the pneumonia that had gradually worsened over the course of the trial.
 19. Due to the difficulties in my trial schedule, the judge's absolute refusal to accommodate these difficulties, my physical and mental exhaustion and, ultimately, my physical illness, I was completely unprepared for trial.
 20. Because of the pressure being exerted by the judge to bring this case to trial, the lack of time and my physical condition, I had neither the time nor the energy to review witness statements or develop strategy. As a result, much of what I did for the defense was purely reactive and did not reflect any particular strategy (other than responding to the prosecution's case as it developed and as best we could, given the circumstances surrounding our preparation for trial).
 21. At trial, my paralegal would hand me witness summaries that I would attempt to read during the state's examination of the witness. Thus, I often missed the thrust of the direct testimony and had no plan as to how to cross-examine or what important points had to be brought out in cross-examination. In addition, the witness summaries prepared by my paralegal did not have the other documents (i.e. investigator's reports, prior criminal records) attached to them so that my ability to impeach witnesses was severely limited. I had no opportunity to interview or talk with witnesses prior to trial and did not talk with any witness before they appeared at the courthouse.
 22. Barry Wilford, former counsel for David Myers, contacted me in late-December and told me that he had been contacted by the family and asked to get back in the case strictly to handle the DNA issues. Although I had attempted to get co-counsel involved earlier, the family and I never reached an agreement on funds and thus, I had no money to hire co-counsel. Before Mr. Wilford's call, I had no plan as to how to handle the state's DNA evidence. I had never tried a case that involved DNA evidence. I was pleased by Barry Wilford's entrance into the case although, in truth, Mr. Wilford's late entrance into the case did not allow sufficient time to adequately prepare a defense against the State's DNA evidence.
 A. By the time that Mr. Wilford re-entered the case, it was far too late to ask for additional testing for DNA evidence.
 B. Because I had never had a DNA case before and because I had insufficient time prior to trial to learn about this procedure, I did not develop any evidence regarding the DNA analysis done by Dr. Edward Blake. This is also why, when Barry Wilford called me about handling the DNA part of the trial, I left it entirely to him. I never thought about attempting to develop alternative sources for the one hair found on the victim's body. The fact that Dr. Blake acknowledged that the DNA residue resulting from the PCR analysis revealed a mixed sample was not significant to me and I did not attempt to investigate or develop this fact.
 C. Although I may have been told some time earlier that possibly a Dr. Kandico had been consulted regarding the DNA and had concluded that the 2 pieces of hair sample tested by the State probably came from 2 different sources, I did not pursue this and Mr. Wilford did not have time to pursue it either.
 D. Although additional hairs were found by my investigators in January, 1995, due to my being consumed by my other trial responsibilities, I did not have the time to properly focus on the significance of these hairs and the possibility of alternative sources (including Beverly Ely, Greg Grimes, or Terry Rogers). Because Barry Wilford didn't enter the case until late December of 1995, I know that he didn't have the time either.
 23. As the case progressed and my exhaustion and illness increased, I relied increasingly upon Barry Wilford to handle expanded portions of the trial. Because he had just been contacted by the family and had not been involved in the case in two or more years, he was unfamiliar with the case, as it had developed over the years since the first indictment, Mr. Wilford simply was unprepared to handle many of the new issues in the case and did not have adequate time to prepare.
* * * *
 27. I was aware of the theory that Gregg Grimes was a far more likely suspect than David Myers.
 A. I knew that Grimes had admitted committing a burglary earlier in the evening when Amanda Maher was killed.
 1. I did not know that Grimes had, in fact, committed FOUR burglaries that night and if I had known this fact, I would certainly have examined him on this fact.
 B. In the course of one of the burglaries, Grimes admitted that he had left railroad spikes under car tires at the home that Grimes burglarized.
 1. The home that Grimes burglarized was the place where Grimes' former wife/girlfriend, Kim Grimes was staying. Mr. Grimes had previously brutalized Ms. Grimes.
 C. The victim in this case was found with a railroad spike driven through her temple less than 200 yards from the scene of the burglary committed by Grimes.
 D. At the trial of this matter, Grimes testified that he had been at the scene where the body was later found and that he had seen the victim lying on the ground with a railroad spike in her temple. At the time of this testimony, I was unaware that despite giving prior statements, Grimes had never previously testified that he had been at the scene of the murder or had actually seen the victim lying on the ground.
 E. Because I was unaware that Grimes had omitted this information from his prior statements, I did not emphasize that fact in any manner in my re-direct examination of Grimes. Frankly, I did not realize the significance of Grimes' testimony until I spoke with post-conviction counsel.
 F. I was aware that Gregg Grimes had made significant admissions to Kim Grimes to the effect that he [Grimes] had killed Amanda Maher and/or that he helped Terrence Rogers kill Amanda Maher. I was further aware that Kim Grimes had so testified at a pretrial hearing during the pendency of the first indictment (some 6 years before the trial). I had investigators looking for Kim Grimes, but we never found her. I did not present her prior recorded and sworn testimony to the jury.
 28. Another significant piece of evidence for the State was the testimony of Clarence David Tincher, a jailhouse informant who alleged that, while they were in jail together, Mr. Myers had told him things that Mr. Myers could only have known if he was involved in the murder.
 A. Although it was my belief that the information attributed by Tincher to Mr. Myers (regarding the manner and means of the victim's death) was generally known in and around Xenia, I did not have enough time to pursue my belief.
 B. Likewise, I should have determined who visited Tincher while he was in jail and whether he learned any of that information from visitors.
 C. In addition, had I time to have done so, I would (and should) have pursued interviews of personnel in the Coroner's Office.
* * * *
 33. In part due to my having spent the preceding year in other trials and on other matters and in part because my relationship with Mr. Myers (and his family) deteriorated dramatically throughout my representation, I was physically and emotionally unprepared to handle the mitigation phase of this case. Further, I simply did not have the familiarity with my client necessary to adequately present mitigation evidence.
 A. Accordingly, I asked Mr. Wilford, who had represented Mr. Myers years earlier, to handle this phase of the case. Mr. Wilford did not have adequate warning or time to prepare for this critical phase of the case.
 B. The mitigation hearing was set two weeks after the guilt phase and Mr. Wilford had to interview witnesses, arrange for their testimony and work with David Myers on his testimony. The mitigation phase of the trial reflects the lack of prior preparation and planning for this stage.
Myers presented the affidavit of Attorney Barry Wilford in aid of his petition. (Exhibit B). The following paragraphs of Wilford's affidavit are pertinent to the ineffectiveness claim:
 6. When I received the case, I reviewed the files of Jeffrey Moore and Michael Dobyns. Contained within these files I recall seeing a photograph of Mr. Myers right hand. This photograph showed that his right ring finger was mangled, bulbous at the tip, and that his fingernail did not reach the end of his finger due to an injury he sustained in July of 1988. We intended to use this photograph at trial as the autopsy report and diagrams prepared by Dr. Mannarino revealed fingernail marks on the victim's neck. This photograph was essential to our defense case as it established that Mr. Myers could not have left those marks with his right hand.
 7. I recall talking with Tami Pappas (f/k/a Wahl) the investigator that was initially retained by Jeff Moore and Mike Dobyns. Tami Pappas had taken the photographs of Myers hands and in addition, reviewed the slating card for Glenn Smith prepared at the time he was arrested on August 4, 1988. Tami specifically recalled seeing a listing for a black wallet and cash in the amount of $123.67 on the property card. This was an important piece of evidence in our defense because two wallets with identification for Glenn Smith and Amanda Maher were allegedly found in Mr. Myers' car. Ms. Pappas was unable to get a copy of this card because the copier at the jail was broken on the day she found it. She did, however, take notes and relayed this information to Mr. Myers' then-attorneys. We attempted to get this property card but, by the time we were searching for it, the cards had been changed to microfiche and the original cards were destroyed. The microfiche of this card for the slating of Glenn Smith does not contain a listing of a wallet or cash in the amount of $123.67.
 8. When Dennis Pusateri and I entered the case, we learned that former counsel had obtained the residue of DNA material on the one hair found on the victim. They gave that residue to a Dr. Kandico in Akron for independent testing. Mr. Pusateri and I met with Dr. Kandico and discussed his testing and results. Dr. Kandico indicated his testing results indicated that two different hairs were tested by the state. Although I had not decided whether to use Dr. Kandico or not, the prosecutor nollied the aggravated murder charge prior to my needing to make a final decision. Based on the nolle and my belief (unfounded, in hindsight) that Mr. Myers would not be re-indicted, I left the remaining DNA residue with Dr. Kandico and never contacted him again.
 9. Mr. Myers was re-indicted for aggravated murder in a secret indictment in January of 1993. He was served with this second indictment approximately one week before he was to be released from prison after serving time for the forgeries referred to in paragraph 5 above. Dennis Pusateri and I were retained to represent Mr. Myers in this action. Again, we began our preparation for trial. It became clear to both David Myers and me that Dennis Pusateri was not up to trying Mr. Myers' case. Mr. Pusateri was having difficulty dealing with a great deal of personal matters and that difficulty clearly affected his performance. Following discussions with David Myers, it was mutually decided that he would seek different counsel.
 10. Mr. Myers' family subsequently hired William F. Summers to represent David. I contacted Mr. Summers and offered to provide all of our files and to meet with him to discuss the case. With Mr. Pusateri, I met with Mr. Summers on at least three occasions. At that point, I believed Mr. Myers case was in Mr. Summers hands.
 11. In mid-December of 1995, (six months later), I received a call from Lou Ann Murphy, David Myers sister. She was extremely concerned about Mr. Summers' representation of David and asked for my involvement in the case to handle the DNA part of the trial. It was her understanding that Mr. Summers had not prepared for this portion of the trial and did not intend to challenge the DNA testimony in any manner. Based on my knowledge of the case in 1993, I believed that this was (and would be) a critical part of the trial that required experts for the defense. I talked with Mr. Summers and he welcomed my reinvolvement in the case. I filed a Notice of Appearance on December 21, 1995 and began immediately to prepare for trial. At the time that I became involved in the case again, it was being continued from week to week because Mr. Summers was in trial in Columbus.
 12. Mr. Myers' trial began on January 2, 1996. Two weeks after Mr. Summers concluded a securities fraud trial in Franklin County that had lasted for six months. It became immediately clear to me that Mr. Summers was totally mentally and physically exhausted and physically ill when the trial began. (Mr. Summers illness during the trial grew progressively worse to the point he ultimately developed pneumonia by the time the trial was over.)
 13. I was not present for voir dire but was present for opening statements. When I heard Mr. Summers opening statement, I was shocked. Although I had been away from the case for several years, I believed, based on the case as it was in 1993, that Mr. Summers was not pursuing any defense theory that could have and should have been pursued. Mr. Summers performance deteriorated during trial and my role continuously expanded although I was not prepared to handle the entire defense. Mr. Summers was obnoxious and bullying to me, to David Myers, to the court, prosecution and the jury and was totally unprepared for trial. Witness statements could not be found when witnesses were testifying and it was clear to me that Mr. Summers had failed to talk with any witness before trial. He relied solely on his paralegal, Christine Watson, to hand him summaries that she had prepared from whatever information they had. It was also clear to me that there was no cogent defense theory being followed by Mr. Summers. He adopted a "shotgun" approach in cross-examination that failed to communicate any one point clearly. He seemed to lack any big picture of the case. As previously mentioned, as Mr. Summers health continued to deteriorate he skipped hearings and appearances at every opportunity.
* * * *
 17. The defense listed Greg Grimes, (previously identified in paragraph 3.A.) as their witness and attempted to serve him through the Xenia Police Department, which was the address listed for Grimes on the State's discovery. Basically, the State attempted to hide Mr. Grimes and refused to give a current address although it was clear that they were meeting with Mr. Grimes on a daily basis during the trial. This refusal hindered the defense in that we could not talk with Grimes prior to his testimony. Two days before he was to be called the State finally served the subpoena on behalf of the defense. Nevertheless, no one from the defense was able to talk with Grimes before he testified. Greg Grimes was a critical witness and in fact, the most likely suspect. During Mr. Schenk's cross-examination of Greg Grimes, Mr. Grimes admitted being at the crime scene on the railroad tracks with the victim, Amanda Maher. This was the first time that Greg Grimes had testified and this revelation did not appear in any of his numerous prior statements made to the police and/or prosecuting authorities. Mr. Summers failed to mention (and I believe failed to recognize) this revelation in his redirect examination. In fact, Mr. Summers spoke so quickly during the examination of Mr. Grimes, I could not follow it and I'm certain the jury could not understand it either. It was clear to me that Mr. Summers was neither familiar with Grimes' prior statements nor had he properly prepared for the examination of this critical witness.
 18. Mr. Grimes was not the only witness for whom Mr. Summers was unprepared. He had not reviewed the witnesses' prior statements before trial and relied solely on his paralegal's summaries. After reading things about the case in the newspaper, witnesses came forward during trial and Summers failed to investigate them before putting them on the witness stand.
 19. Additionally, Mr. Summers never used the photograph of David's hand, which showed he could not have left four fingernail marks on the body of the victim. Further he also was totally unprepared to present any evidence on the accident in which Mr. Myers had been involved in July of 1988 (which caused the injury to his hand) and, at the last minute, put on a witness that Sandy Myers (David's wife) found regarding the injury. This witness was not interviewed by Mr. Summers before he testified and Mr. Summers failed to prepare the witness for any cross-examination. Mr. Summers failed to obtain the actual doctor that had treated Mr. Myers relating to this accident.
 20. Mr. Summer's lack of preparedness for this trial is obvious from the record regarding the testimony of Det. Robert Young. Det. Robert Young had been consulted by Mr. Myers' original counsel, Jeffrey Moore. He was not talked with after Mr. Moore got off the case in 1990, but Mr. Summers subpoenaed him and still called him as a defense witness although he found out that Det. Young had prepared a report for the prosecution that supported the prosecution's theory of the case. There was no strategy involved in this decision. Mr. Summers was merely angry and wanted the witness to know it. Why he felt it was important to put him on the stand escapes me.
 21. Following the verdict in Mr. Myers trial, Mr. Summers went to Florida. This was between the trial and sentencing phase. Due to Mr. Summers failure to conduct any mitigation investigation, I was left to prepare both David and his family for the mitigation phase. As previously stated Mr. Summers had developed pneumonia by the time the trial was over. Summers became angry with me for not consulting him while he was in Florida about the mitigation preparation.
 22. Based upon my experience as a lawyer, I can say without reservation that Mr. Summers was not prepared to try this case and as a result David Myers received ineffective assistance of counsel throughout the trial.
 23. Based on the relationship between Mr. Summers and myself and the inability to communicate with each other as the trial progressed, I also rendered Mr. Myers ineffective assistance of counsel. My ineffectiveness was compounded by the fact that I got back in the case at such a late date without knowledge of the additional investigation and preparation done by the prosecution and without knowing my role would greatly expand as the trial progressed.
Further affiant sayeth not.
Attorney Dennis Pusateri submitted his affidavit as well. Pusateri stated that he served as Myers' co-counsel with Barry Wilford from April 1990 until mid-1993 when he withdrew because of severe chronic depression. The following paragraphs are pertinent on the ineffective claim.
 16. Despite my incapacity, and because of my own belief as well the belief of others that I understood this complicated case better than anyone else, I consulted with William L. Summers, (Mr. Myers' subsequent trial counsel) and his defense team in their preparation for Mr. Myers trial. The more time that went by, the more apparent it became that Mr. Summers was not adequately prepared to try the case. He was totally occupied with another long jury trial in Columbus, Ohio and was obviously ill. During our conferences, Summers quickly became lost when the facts were being discussed. Prior to trial, I observed a neatly organized trial notebook that had been prepared by Mr. Summers' paralegal, Christine Watson. The notebook contained summaries of the testimony of each potential witness. While the summaries would have been helpful, it was obvious that Ms. Watson had prepared the summaries without a complete understanding of the case or the significance of each witness' information within the context of the entire case. It was likewise clear that the summaries (and the notebook) had been prepared without any substantial consultation with a trial lawyer or Mr. Summers (although, in Mr. Summers' case, such consultation would have been futile because of Mr. Summers' lack of facility with the case facts). I asked Mr. Summers whether he was planning on trying the case from Ms. Watson's summaries and he assured me that the summaries were mere synopses, and that he would be "down" with the details of the case by trial time.
 17. I was present for approximately half of Mr. Myers' trial. I was shocked and dismayed to see that Mr. Summers was, in fact (and obviously) trying the case solely from Ms. Watson's summaries. Because it was apparent that I still had a far greater understanding of the case facts than did chief trial counsel, Mr. Summers' omissions and lack of familiarity with the facts were painful to watch. It was clear that many of Mr. Summers' major decisions were not tactically or strategically calculated, but were simply the result of proceeding with inadequate time, preparation or knowledge.
 18. I was prepared to testify in David Myers trial regarding my review of over four hundred (400) police reports from the Xenia police department. These reports dealt with reported crimes between January and August 1988 in the vicinity of the murder scene. The significance of the reports was to show that the use of railroad spikes in the commission of crimes was quite unique. Based on my review of each report, I would have testified that between January and August 1988, only two crimes involved the use of railroad spikes. One crime involving railroad spikes was Greg Grime's burglary and vandalism of 399 Locust Street on the same night of the capital offense. The other crime involving railroad spikes was the murder of Amanda Maher which occurred about one hundred yards from the site of Grimes Locust Street burglary.
 19. Several times during Mr. Summers' pretrial representation of Mr. Myers, LuAnn Murphy (Mr. Myers' half-sister) informed me that Mr. Summers had told her that no work was going to be done on Mr. Myers' case until substantial additional funds were paid to him.
 20. Toward the end of the trial, I was present after the close of court. The trial was not scheduled to reconvene until the following week. The weather was cold and snowy. Mr. Summers very badly wanted to return home to Cleveland for the weekend. A meeting was held at which were present Mr. Summers, Mr. Myers, Mr. Wilford, Ms. Watson, two of Mr. Summers' associates (an investigator and a young attorney, Aneil Anthony) and myself. The subject of the meeting was whether or not Mr. Myers should testify on his own behalf on the following Monday morning or whether the defense should rest. Each person, in turn, expressed his or her opinion. Only Mr. Wilford and I advised Mr. Myers that he should testify. Mr. Summers was the last person to express his opinion. He frightened Mr. Myers to death (no pun intended) about the ordeal of testifying itself, and specifically said that he believed the case was in a winning posture, which, due to the ineptitude with which it was defended, it was clearly not. At that point, Mr. Myers retained considerable trust in my opinion and he was obviously uncomfortable receiving conflicting advice. Mr. Summers literally browbeat him into not testifying and then left the meeting to get on the road to Cleveland. It is my belief that Mr. Summers advice to Mr. Myers was motivated by his desire to avoid staying in Greene County over the weekend to prepare Mr. Myers to testify and not considered trial strategy. In both my personal and professional opinion, Mr. Myers' decision was neither knowing, intelligent nor voluntary.
Christine Watson submitted her affidavit as well. She stated she began working as a paralegal for William Summers in mid-1994. She corroborated much of the other affiants' statements. She stated that neither she nor Mr. Summers interviewed most of the trial witnesses prior to their testifying. She stated that any work done in respect to mitigation was performed by Barry Wilford shortly before the trial began.
Kim Grimes provided the following affidavit in support of Myers' petition:
 AFFIDAVIT
State of Indiana
County of Marion
 I, Kim Grimes, be duly cautioned and sworn, deposes and states the following:
 1. I married Gregg Grimes in 1986 and was divorced from him in May of 1988. Throughout the marriage and even after we separated, Gregg was very violent. He often threatened me, beat me, trashed the house and left threatening notes.
 2. In July of 1988, I was separated from Gregg Grimes and living in Xenia, Ohio. Gregg repeatedly found out where I was living, burglarized and trashed my house, as well as friends' homes I stayed with, and threatened to kill me on numerous occasions. He also physically assaulted me on numerous occasions. I specifically remember on one occasion within a few days of the murder of Amanda Maher on August 4, 1988, Gregg dragged me by the hair to the railroad tracks where Amanda was found. He ran away when neighbors yelled at him.
 3. I went to Greene Memorial Hospital on several occasions due to injuries inflicted by Gregg Grimes. In particular, I went to Greene Memorial Hospital on November 15, 1989 and received stitches following Gregg ripping my vagina with his hand.
 4. After the death of Amanda Maher, Gregg Grimes admitted to me on more than one occasion that he had killed Ms. Maher. At times, he claimed that he killed her by himself and at other times he claimed Terrence Rogers was also involved. I told this to investigators working for David Myers defense during the time frame of 1988 to 1990 of these admissions. I also testified at a hearing in the Greene County Courthouse on March 8, 1989 regarding these admissions. I also agreed to wear a hidden transmitter or recorder to the London Correctional Institute where Gregg was incarcerated at that hearing in an attempt to record these admissions. Following my agreement to wear a wire, no one ever contacted me about the arrangements and thus, I never recorded Gregg's admissions.
 5. William Schenck and other representatives of the Greene County Prosecutor's office talked with me on several occasions and also talked with Gregg during my presence on several occasions. I also told these people of Gregg's admissions, of my fear of Gregg and my concern that he was involved in the death of Amanda Maher. On one occasion, William Schenck took me to dinner at Elsa's Restaurant and I repeated to him these admissions and my concern that Gregg was involved in the murder of Amanda Maher. The prosecutor and his representatives always discouraged me from talking with David Myers's defense attorneys or investigators.
 6. I received small amounts of money from representatives of the prosecutor's office during 1988 to 1990 basically whenever I showed up and asked for money. These amounts were usually $10 to $20.00. I also was with Gregg on occasions when he received money from representatives of the Greene County Prosecutor's Office. On one occasion when both Gregg and I went to the prosecutor's office, we met with Steve Haller. Mr. Haller had photos on his desk and I asked what they were. Mr. Haller told me that they were the photos from the Maher killing. Gregg asked if he could look at them and looked through the whole set of photographs. I remember seeing photos of the scene, David Myer's vehicle and the victim, Amanda Maher.
 7. I believed that David Myer's attorney always knew where to find me. In fact, Dennis Pusateri and Barry Wilford helped me to move to Columbus, Ohio in 1993. After residing in Columbus, I moved to Indpls. and subsequently moved to Indpls. I do not recall ever talking with a William Summers or any investigator that told me they were working for David Myers from 1993 until 1997 when an investigator from the Ohio Public Defender's Office contacted me in Indiana.
 8. I was not aware that David Myers was tried and convicted of the murder of Amanda Maher in January of 1996. Nor was I aware that the defense attorneys were looking for me prior to that trial. I was never asked to testify in 1996 for the defense or the state. Had I been contacted I would have been willing to testify.
Further affiant sayeth naught. /s/Kim Grimes
 Sworn to and subscribed before me this 14 day of Sept. 1999. /s/ Jo Ann Brown Notary Public
The trial court overruled Myers' first claim for relief stating that claim was barred by "res judicata." The court noted that we addressed Myers' ineffective assistance of counsel claim in the direct appeal and overruled it with the observation that "Myers was represented by highly competent counsel who put up a rigorous defense in the face of overwhelming evidence of guilt." The trial court also found that Myers failed to present "cogent evidence" dehors the record that would warrant a hearing on this claim of ineffectiveness.
R.C. 2953.21(C) provides in pertinent part that "before granting a hearing on the petition filed under division (A) of this section, the court shall determine whether there are substantive grounds for relief. ". . . If the court dismisses the petition, it shall make and file findings of fact and conclusions of law with respect to such dismissal." The Ohio Supreme Court has held that it is not unreasonable to require the defendant to show in his petition that he has suffered constitutional prejudice before a hearing is scheduled. State v. Jackson (1980),64 Ohio St.2d 107. The court stated that "if we would allow any open ended allegation or conclusory statement concerning competency of counsel without a further showing of prejudice to the defendant to mandate a hearing, division (D) of R.C. 2953.21 would be effectively negated and useless." Jackson, at 112.
In the appellate opinion, we observed that Myers was represented "by a highly competent retained counsel who put up a vigorous defense in the face of overwhelming evidence of guilt."
The trial record did not reflect that Attorney Summers had delegated most of the responsibility of interviewing State's witnesses to his paralegal. Nor did we know that Mr. Summers did not read these summaries until direct testimony was being elicited from the State's witness.
We do not find it consequential that Summers did not know that Gregg Grimes had committed four burglaries, as opposed to just one burglary, on the night before Amanda Maher's murder. We also do not find consequential that Summers failed to cross-examine Grimes about his failure to admit to seeing Amanda Maher lying on the ground. Importantly, at trial Grimes admitted to committing a burglary within two hundred yards of the crime scene and admitted seeing Amanda's body. We fail to see how demonstrating that Grimes' failed to admit this to police in earlier interviews would have been likely to have affected the outcome of the trial.
Summers' failure to present the prior recorded testimony was ineffectiveness which should have been raised on direct appeal as that pre-trial testimony was available to appellate counsel.
Summers contends he should have determined who visited Clarence Tncher in the jail to see if they had informed Tincher of certain details concerning the homicide. This contention of ineffectiveness is speculative as there has been no showing that a jail visitor provided any information to Clarence Tincher.
Summers indicated he was not prepared to present mitigation evidence but delegated that responsibility to Barry Wilford who had two weeks to prepare for this phase of the trial after Myers was convicted. Summers does not suggest what mitigating evidence was available which was not presented to the jury by Wilford.
Barry Wilford stated that Attorney Summers was ineffective because he was not pursuing any defense theory "that could have and should have been pursued." Wilford does not explain what defense theory should have been pursued by Summers.
Wilford criticizes Summers for failing to introduce the photograph which would portray the injury to Myers' ring finger. The jury however heard testimony that Myers' ring finger was injured at the time of the homicide. Indeed, Dr. Krause testified that the fingernail marks he observed on the victim's neck was consistent with an injury to the assailant's ring finger.
Dennis Pusateri stated he believed Summers was ineffective because he tried the case solely using his paralegal's witness summaries. He also opined that Summers advised Myers not to testify in his own behalf because he believed Summers didn't want to stay in Xenia and prepare Myers for his testimony.
Kim Grimes stated that Attorney Summers never interviewed her although she would have testified that her former husband admitted killing Amanda Maher.
The United States Supreme Court has established a two-step process for evaluating an allegation of ineffective assistance of counsel:
 "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland v. Washington (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693.
In evaluating whether a petitioner has been denied effective assistance of counsel, this court has held that the test is "whether the accused, under all the circumstances, * * * had a fair trial and substantial justice was done." State v. Hester (1976), 45 Ohio St.2d 71, paragraph four of the syllabus. When making that determination, a two-step process is usually employed. "First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness." State v. Lytle (1976),48 Ohio St.2d 391, 396-397, vacated on other grounds (1978), 438 U.S. 910.
We conclude that the trial court properly denied Myers' first claim without providing him an evidentiary hearing because assuming the truth of the affidavits, Myers failed to produce cogent evidence that he was denied the effective assistance of counsel at his trial. In other words, there is simply no reasonable probability that the result of Myers' trial would have been different had Mr. Summers prepared better for trial and not been under the weather during part of the trial. There does not appear to be any exculpatory material that counsel did not pursue. Reasonable attorneys often differ on the wisdom of placing their clients on the stand when doubts about the defendant's guilt have been placed before the jury. In short, the trial court appropriately addressed this claim by overruling it without a hearing.
In his second claim, Myers claims his convictions should be vacated because the State engaged in egregious misconduct in dismissing the initial indictment without a hearing and subsequently reindicting him two years later. Myers also claimed the State's misconduct violated his right to substantive and procedural due process as well as his right to equal protection of the law guaranteed by the Fourteenth Amendment. Myers contended that he needed "discovery" in order to fully develop this claim. The trial court found this claim barred by the defense of res judicata because this court concluded that Myers suffered no prejudice from the State's conduct in this respect and Myers failed to present any cogent evidence demonstrating that this claim could not be fairly ruled upon by the court of appeals in the direct appeal. We agree with the trial court's resolution of Myers' second claim. The speedy trial claim was specifically addressed in the direct appeal of this matter, and was thus barred by the defense of res judicata and there was no cogent evidence dehors the record which would mandate a hearing on this claim.
In his third claim for relief, Myers contends his conviction should be vacated because the State presented perjured testimony in his trial. Myers referred the court to Exhibits F and G. Exhibit F is the affidavit of Kim Grimes and Exhibit G is the affidavit of Gregg Hamilton, an investigator for the Ohio Public Defender.
In Kim Grimes' affidavit she states that former husband Gregg Grimes admitted to her on more than one occasion that he killed Amanda Maher. Grimes was called as a defense witness at trial and Grimes admitted he may have told Kim Grimes that he killed Amanda Maher, but he denied any involvement.
It is unclear what Myers claims is the perjured testimony. If Grimes killed Maher and denied doing so at Myers trial, that would be perjury. But the State did not present Grimes as their witness and Grimes admitted he may have told his former wife he committed the murder. We agree that this claim is not barred by res judicata, but the supporting material does not support a claim that the State presented perjured testimony. The trial court properly denied this claim without providing a hearing.
In his fourth claim, Myers contends his conviction should be vacated because the State engaged in misconduct in withholding exculpatory evidence in violation of Brady v. Maryland (1963), 373 U.S. 83. Additionally Myers claims he was prevented from developing exculpatory evidence by the State's withholding of certain information that would have led to exculpatory information. Myers sought discovery to fully develop this claim. Myers did not specifically state what exculpatory evidence was withheld by the State. In its motion to dismiss, the State argued that Myers offered no proof that the State had withheld evidence favorable to Myers and noted that Tami Wall had testified at trial that Glenn Smith's book-in card had been altered. In a memorandum filed contrary to the State's motion, Myers does not respond to the State's argument that his claim is barred by res judicata. The trial court overruled this claim because Myers offered no evidence that the State withheld favorable evidence to him, and the jury heard Tami Wall's testimony and Myers could have argued that her testimony raised a reasonable doubt concerning the State's evidence but did not do so. We agree as to this claim Myers failed to set forth sufficient "operative facts" to establish substantive grounds for relief on this claim.
In his fifth claim, Myers claims his conviction should be vacated because the State engaged in a "retaliatory" prosecution of him because he filed a 42 U.S.C. § 1983 action against the City of Xenia, Greene County Commissioners, and the Greene County Prosecutor. The State argued that this claim was barred by the defense of res judicata because the fact of the lawsuit was present in the appellate record and could have been raised on direct appeal. The trial court overruled Myers' fifth claim on res judicata grounds. We agree with that finding.
In his sixth claim, Myers claims he was denied procedural and substantive due process and the equal protection of the law by the State denying him access to witnesses. Myers referred the trial court to Exhibit I which is a letter from Assistant Prosecutor Stephen A. Wolaver to Myers' counsel supplementing previous discovery provided Myers in the case. In its answer the State argued that Myers failed to specify what witnesses the State denied him access. The State did note that his counsel, William Summers, complained at the trial about an inability to locate certain witnesses but, to that extent, any such claim on the record is subject to the defense of res judicata. Myers was not more specific in his memorandum filed in response to the State's dismissal motion. The trial court found that this claim was unspecific and failed to demonstrate substantive grounds to warrant a hearing on the claim. We agree with the trial court's disposition of this claim.
In his seventh claim, Myers claims his convictions should be vacated because the State intentionally delayed filing the second indictment. Myers referred the court to Exhibits A, C, D. Myers contended the State's action resulted in witnesses being lost, access to exculpatory evidence was lost, and he exhausted funds for his defense during the delay. The State again asserted the defense of res judicata. The trial court overruled this claim on the basis of the defense of res judicata because we concluded in the direct appeal that Myers' speedy trial rights in this respect were not violated.
We specifically found in the direct appeal that Myers failed to demonstrate that he suffered any prejudice as a result of the delay in indicting him the second time. (see this court's resolution of the third assignment of error in the direct appeal). The trial court also appropriately dismissed this claim.
In his eighth claim, Myers claims his convictions should be vacated because the State paid witnesses to provide information and to discourage them from talking with the defense. Myers referred the court to Exhibits B, C, F, G. Myers also sought discovery in aid of this claim. In Exhibit B, Barry Wilford stated that he discovered early on in the first prosecution that the prosecutor used FOJ funds to pay Gregg Grimes and Kim Grimes. Kim Grimes stated in Exhibit F that she received small amounts of money from representatives of the prosecutor's office from 1988 — 1990 upon her request. The amounts were usually $10 — $20. She said she was also present when Gregg Grimes received money from representatives of the prosecutor's office. Matt Franklin stated that Gregg Grimes stated that Prosecutor William Schenck gave him money because he was unemployed and needed money for living expenses.
The State argued that this claim was barred by res judicata because Myers raised objections to the prosecutor's conduct in pre-trial hearings in November and December 1990 and no new cogent evidence was presented to defeat the application of res judicata. The trial court agreed with the State's position. We agree with the trial court's resolution of this claim as well. Myers' or his counsel were aware early on that the prosecutor was allegedly giving small amounts of money to Gregg and Kim Grimes. Myers was duty bound to raise any claim of prosecutorial misconduct related to these payments in the trial court prior to his conviction. This claim is barred by res judicata.
In his ninth claim, Myers contends his conviction should be vacated because the State conducted a biased investigation resulting in its failure to develop evidence that pointed to the real perpetrator. Myers asked the trial court for funds to hire experts to perform independent testing on evidentiary items the State failed to test. Myers contended he needed a fingerprint expert, a DNA expert able to test for mitochondrial DNA, a forensic pathologist, and a crime scene expert able to review the crime scene investigation performed in this case. Myers contends that a denial of these funds would deny him substantive due process. He sought discovery to more fully develop this claim. In its answer, the State asserts that it dismissed the initial indictment and reinvestigated the case. The State asserts that additional DNA testing was completed of potential suspects and they were eliminated as potential donors of the suspect hair found in the victim's body. The State also asserts this claim is barred by the defense of res judicata. The trial court found this claim barred by res judicata because no cogent evidence was presented outside the record that would require an evidentiary hearing. We agree with the court's resolution of this claim.
In this tenth claim, Myers contends his convictions and sentence should be vacated because his due process rights were violated when the State introduced "other acts" evidence not related to the crimes charged in the indictment. We must overrule this claim because we found in the direct appeal that the "other acts" evidence was not properly admitted but was not grounds for reversal.
In his eleventh claim, Myers contends his convictions and sentence should be vacated because the State offered deals to witnesses to testify against him without fully disclosing those deals to him. Myers referred the trial court to Exhibits O and P. The State argued in its answer that no evidence had been presented in aid of this claim. The trial court agreed that Myers had failed to support these allegations and overruled this claim. We have examined petitioner's Exhibits O and P and can find no support in them that the State offered deals to witnesses in exchange for their testimony. The trial court also properly overruled this claim.
In his twelfth claim, Myers claims his convictions should be vacated because he was denied a speedy trial. He claims he objected to the nolle prosequi of the first indictment without prejudice to a second indictment but his attorneys failed to communicate his objection to the court. The trial court held this claim was barred by the defense of res judicata and no new cogent evidence was offered to defeat that defense.
In the direct appeal, we held that Myers was not denied his right to a speedy trial under the United States and Ohio Constitutions. We specifically found that the nolle prosequi was not entered in bad faith by the State but was done to conduct additional investigation of other suspects. It is therefore of no moment whether Myers agreed or disagreed with the nolle. The trial court properly dismissed this claim without a hearing.
In his thirteenth claim, Myers contends his convictions should be vacated because the State breached an agreement with lawyers when they obtained a second indictment against him without permitting his counsel to offer "input" or evidence to the second grand jury. In his petition, Myers contends that his counsel turned over non-discoverable exculpatory evidence to the State as well as offering a time waiver for the State's agreement that he be permitted to present matters to any subsequent grand jury. Myers contended that the State's breach of the agreement resulted in a violation of his due process rights. Myers sought discovery to more fully develop this claim.
In its answer the State argued that it made no such agreement and in any event there were numerous hearings regarding this issue prior to the commencement of the trial and the claim is thus barred by the defense of res judicata.
Res judicata bars claims which were previously litigated as well as those that could have been litigated in previous proceedings. It is quite evident that this claim was ripe when the second indictment was issued and Myers was duty bound to raise his claim that the prosecutor violated the agreement at that time. This claim is barred by the defense of res judicata.
In his fourteenth claim, Myers claims that his conviction should be vacated because the State presented a false affidavit in order to obtain the search warrant used for the authority to search his car. Myers referred the trial court to Exhibit F (the affidavit of Kim Grimes). This claim must be overruled because we specifically held in the direct appeal that Myers had failed to demonstrate that an intentional or reckless falsehood was employed in the affidavit for the search warrant.
In his fifteenth claim, Myers claims that his convictions should be vacated because the trial court was biased against him and his counsel. In support of his claim, he submitted the affidavits of William Summers and Christine Watson, Summers' paralegal. In particular, Myers alleges the trial court demonstrated its bias in favor of the State by permitting "other acts" testimony and by denying Myers a continuance when his lawyer was unprepared for trial.
Summers stated in his affidavit that the trial judge turned the heat up in the courtroom before his final argument causing the jury to fall asleep at times. Christine Watson corroborated Mr. Summers' affidavit in this regard.
The trial court found that Myers had failed to present substantive grounds for relief on this claim and we agree. Myers should have raised the bias claim before the trial concluded and then raised this issue on direct appeal. In any event, neither Summers nor Watson's affidavit raise substantial grounds for relief on the claim the trial judge denied him a fair trial because of bias.
In his sixteenth claim, Myers claimed his conviction should be vacated because the second grand jury was biased as a result of certain extraneous statements by a grand juror. Myers sought discovery to more fully develop this claim. The trial court properly overruled this claim on the grounds of res judicata. We agree. We resolved this claim in the direct appeal in our resolution of Myers' eleventh assignment of error. In his seventeenth claim, Myers claims he was denied a fair trial because of extensive pre-trial and trial publicity. Myers referred the court to Exhibits M and N. He also sought discovery in aid of this claim. The trial court overruled this claim and noted that an extensive voir dire was conducted on this issue and taint by pretrial publicity would be apparent in the record. The trial court found that Myers failed to present any cogent evidence to defeat the application of the doctrine of res judicata.
We have examined the material provided by Myers. Nothing in the news articles were of an inflammatory nature nor did the articles contain evidence of Myers' guilt which was not presented to the jury trial as admissible evidence. There was an extensive voir dire conducted in this case to ensure that Myers received a fair trial. Myers did not raise this issue on direct appeal. He also never raised this issue despite the fact that these articles were prominently printed in the Dayton Daily News and the Xenia Daily Gazette. It is not appropriate nor fair for a defendant to raise the issue of prejudicial publicity for the first time in a post-conviction relief proceeding when a timely objection might have permitted an appropriate inquiry of the jurors concerning their consideration of these articles. Res judicata applies to those claims which were or could have been litigated in a prior proceeding. This claim was properly overruled also.
In his eighteenth claim, Myers claims the trial court should have vacated his death sentence because Ohio's death penalty "proportionality" review fails to permit consideration of those death penalty cases where a life sentence was imposed. The trial court held this claim was barred by res judicata because this claim could have been raised on direct appeal. We agree. In any event, the Ohio Supreme Court has held that the proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty was imposed. State v. Steffen (1987), 31 Ohio St.3d 111. We specifically found that Myers' sentence was not disproportionate in our resolution of his direct appeal. We, however, agree with Justice Pfeiffer's dissent in State v. Murphy (2001), 91 Ohio St.3d 516, 563, that the universe of cases should include those cases in which the death penalty was not imposed in order to determine if the sentence imposed was proportional.
In his nineteenth claim, Myers claimed his conviction and sentence should be vacated because he received the ineffective assistance of counsel during the "penalty" phase of his trial. In support of his claim, he referred the trial court to Exhibits A, B, C, E, R, and S.
In Exhibit R, Dr. Jeffrey Smalldon, a licensed clinical psychologist, states in an affidavit that he examined Myers on July 30 and August 30, 2000 at Myers' counsel's request to determine whether there existed any psychological issues which may have been overlooked at the time of Myers' trial which might have altered the outcome of the penalty phase of the trial. Smalldon stated he conducted a limited battery of clinical tests and reviewed background records pertaining to the trial as well as Myers' psychological history. He opined that there are "important aspects of Mr. Myers' background and personality makeup which, had the members of his jury trial been made aware of them, might well have served as the foundation for an outcome other than the death sentence that the jury ended up recommending."
Myers also offered the affidavit of Beverly Eley, the former wife of Glenn Smith, who stated Smith was physically abusive to her and told her in 1988, "she was going to get what Amanda got." She stated she thought Smith was involved in Amanda Maher's death although he was in jail at the time of her death. She said she told defense investigator, John Youglin, in 1993 of Smith's statement to her but was not subpoenaed to testify at Myers' trial.
The trial court found this claim again barred by res judicata and by Myers' failure to present cogent evidence outside the appellate record to defeat the application of the doctrine. Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation, and, in addition prejudice arises from counsel's performance. To demonstrate that a defendant has been prejudiced the defendant must show there exists a "reasonable probability" that, were it not for counsel's errors, the results of the trial would have been different. State v. Bradley (1989), 42 Ohio St.3d 136.
A trial court may properly deny a post conviction petition without a hearing where the petitioner does not set forth sufficient operative facts to establish substantive grounds for relief. State v. Jackson (1980), 64 Ohio St.2d 107, 112. The evidence must meet a threshold of cogency. In other words, the evidence must be significant and must materially advance a claim and be more than marginally significant. State v. Coleman (March 17, 1993), Hamilton App. C-90081, unreported.
Dr. Smalldon's affidavit did not indicate what "important aspects" of Myers' background and personality would have provided the jury with a reason to find the death penalty inappropriate in this case. He did not suggest in his affidavit that Myers' psychological condition rose to the level of a mental disease or defect that deprived him of a substantial capacity to appreciate the criminality of his counsel or to conform his conduct to the requirements of the law. See, R.C. 2929.04(B)(3). See, State v. Palmer (1997), 80 Ohio St.3d 541. Counsel did not tell the trial court or us why Beverly Eley's affidavit was relevant to the claim of ineffectiveness during the penalty phase. Presumably counsel believes this evidence should have been presented by trial counsel to create a "residual doubt" of his guilt. Residual doubt is not an acceptable mitigating factor under R.C. 2929.04(B). See, State v. McGuire (1997),80 Ohio St.3d 390. The trial court properly denied this claim without a hearing.
In his twentieth and twenty-first claims, Myers contended his conviction should be vacated because he was denied the effective assistance of counsel at every stage of the prosecution. In particular, Myers alleges his trial counsel failed to:
a. retrieve all files and/or defense evidence
 b. turn over all files and/or defense evidence to new counsel
 c. prepare by reviewing discovery, investigative reports, and witness Statements and prior Statements including grand jury testimony
 d. prepare by interviewing or attempting to interview witnesses prior to their testimony
e. prepare by hiring necessary expert witnesses
f. seek independent testing of evidence
g. file timely motions
 h. develop any strategy in accordance with the facts of the case
 i. develop evidence of a [sic] inadequate crime scene investigation, inadequate autopsy, inadequate DNA testing, and alternative sources for certain State's evidence
j. present exculpatory evidence
 k. develop any theme for opening Statement or closing argument
 l. examine witnesses on inconsistencies and impeaching testimony
 m. make a record of prosecutorial misconduct occurring in the courtroom including the leading of critical witnesses through body actions
 n. ask for a continuance in a timely manner or make a record of his physical inability to try the case.
The trial court overruled these claims because they were barred by the defense of res judicata. The trial court again noted our observation in the direct appeal that Myers was represented by a highly competent and experienced retained lawyer and he failed to present cogent evidence outside the appellate record to require an evidentiary hearing. We agree with that finding. Essentially, these claims are a rehash of those matters raised in the first claim.
In his twenty-second claim, Myers claims the trial court should have vacated his conviction because Ohio's death penalty legislation violates the provisions of the International Covenant on Civil and Political Rights (ICCPR) to which the United States is a signatory and pursuant to Article VI (the Supremacy Clause) state judges are bound to these treaty terms, state law and constitutions to the contrary notwithstanding. The trial court found this claim barred by the defense of res judicata because this issue could have been raised on direct appeal but was not. We agree.
In his twenty-third assignment, Myers claims his death sentence should be vacated because execution by electrocution or lethal injection violates the Eighth Amendment. The State argued that this claim was barred by the defense of res judicata, and the trial court agreed. The trial court noted the claim could have been raised on direct appeal but was not. We agree that this claim is barred from consideration in these proceedings.
In his twenty-fourth claim, Myers claimed that the State conspired to deny him his rights, privileges, and immunities and due process rights as guaranteed by the United States and Ohio Constitutions by taking actions to ensure that he would be prosecuted for Amanda Maher's murder, that no other person would seriously be investigated, and that evidence favorable to him would not be collected.
Myers contended that the prosecution orchestrated the dismissal of the first indictment, indicted him on forgery charges to ensure he remained incarcerated, unable to earn a livelihood, hire a lawyer, or assist meaningfully in his defense.
Myers claimed the State offered deals to witnesses and failed to disclose these deals to him, misrepresented the testimony of witnesses in order to obtain a search warrant, and presented perjured testimony to convict him.
Myers also claimed the State violated Crim.R. 16 by providing him inadequate addresses for witnesses preventing his counsel from adequately preparing for trial. Finally, he contended the State presented "other acts" testimony knowing full well this testimony would prejudicially "taint" his trial. The State again asserted the defense of res judicata which the trial court adopted. Basically, Myers reasserted many of the same claims he made in other parts of the petition and added the claim that the misconduct of the State was the result of a "conspiracy." A petition cannot avoid the application of res judicata by merely asserting that the State's conduct was the result of a conspiracy. The trial court properly overruled this claim.
In his twenty-fifth claim Myers contends his conviction and sentence should be vacated because the trial court incorrectly instructed the jury in both the guilt and sentencing phase of the trial. In particular, Myers contends the trial court failed to properly inform the jury that one of them could prevent a death sentence. The State again raised the defense of res judicata and the trial court agreed that this claim was barred because this claim could have been raised in the direct appeal.
In his twenty-sixth claim Myers claims his conviction and sentence should be vacated because the State engaged in egregious misconduct in destroying or permitting the destruction of an index card kept by the Greene County Sheriff's Department which indicated that Glenn Smith had a wallet containing $123.67 when he was booked into the County Jail on the night of Amanda Maher's murder.
Myers attached the affidavit of private investigator Tami Wall in support of the allegation. Ms. Wall indicated that when she asked to see the card some time later she was informed the index card had been destroyed when the department computerized its records. The computerized record made no mention of the wallet and cash. In its answer, the State points out that Tami Wall testified at trial and informed the jury of this discrepancy. This matter could have been pursued by the defense at trial and on appeal. We agree with the State that this claim is barred by the defense of res judicata.
In his twenty-seventh claim, Myers contends his conviction should be vacated because there is insufficient evidence of his guilt and his conviction is against the manifest weight of the evidence. In aid of this claim, Myers referred the trial court to Exhibits C, D, F, G, S, and AA.
The State raised the defense of res judicata and also asserted that Myers had failed to present cogent evidence outside the trial record to defeat the application of that defense. The trial court overruled Myers' claim noting we had found the verdict was not against the manifest weight of the evidence and Myers had failed to present cogent evidence to defeat the application of res judicata.
We found in the direct appeal that the judgment of conviction was not against the manifest weight of the evidence nor was the evidence insufficient as a matter of law. We have carefully examined the exhibits and find no cogent evidence to defeat the application of res judicata. We specifically found in the direct appeal no substantial prejudice to Myers resulting from the unavailability of Kim Grimes.
Beverly Ely and Helen Ellis' affidavits concerning Glenn Smith offer no cogent evidence in support of this claim. Smith was in jail at the time of Amanda Maher's murder. Dennis Pusateri and Myers' affidavits are similarly of no help in establishing that the judgment was not based on sufficient evidence or was against the manifest weight of the evidence. The trial court properly denied Myers' a hearing on this claim as well as Myers failed to establish substantive grounds for relief.
In his twenty-eighth claim, Myers claims his conviction should be vacated because the State presented the testimony of Dr. Michael Badin and Dr. Cynthia Norrgram without objection of counsel that didn't meet the standards of Daubert v. Merrill Dow Pharm., Inc. (1993), 509 U.S. 579. Myers referred the trial court to Exhibits A, B, C, D and JJ. The State raised the defense of res judicata. The trial court found this claim clearly barred by the defense of res judicata as Myers could have raised the claim of ineffectiveness of counsel in this regard on direct appeal. We agree.
In his twenty-ninth claim, Myers claims his conviction should be vacated because his trial counsel was ineffective in not objecting to the nolle prosequi filed in February 1991 in opposition to his desires. Myers contends this permitted the State to re-indict him and deny him his constitutional right to a speedy trial.
The State argued that this claim had no merit because it was a claim that could have been raised on direct appeal and in any event Myers was not prejudiced by the State's investigating other potential suspects during the time no indictment charging Myers existed. The trial court agreed with the State that this issue could have been raised on direct appeal and also found that no cogent evidence was presented to defeat the application of res judicata.
In our appellate opinion, we held the trial court did not err in overruling Myers' motion to dismiss on a claim that his statutory and constitutional speedy trial rights were violated. We specifically found that the nolle prosequi was not entered in bad faith to avoid speedy trial problems. We found that the record amply demonstrated that the prosecutor nollied the case and commenced the additional investigation at defense counsel's request and insistence that the State had charged the wrong man. We also found the State had rebutted Myers' claim that he had suffered serious prejudice as a result of the delay in bringing him to trial. The trial court properly denied the appellant's twenty-ninth claim without a hearing.
In his thirtieth claim, Myers contended that his conviction should be vacated because he was denied his rights under the American Declaration of the Rights and Duties of Man as applicable to the State of Ohio through the Supremacy Clause. The State asserted this claim was likewise barred by res judicata and the trial court agreed. We agree and also note that a similar claim was rejected by the Ohio Supreme Court in State v. Phillips (1995), 74 Ohio St.3d 72, at 103 and 104.
In his thirty-first claim, Myers sought vacation of his conviction because he alleged the State used a psychic to help prosecutors select the petit jury, prepare witnesses for trial, and make the decision to charge him with capital murder. Myers referred the trial court to Exhibits M and N in aid of this claim.
Exhibit M was an article written by Lynn Hulsey of the Dayton Daily News entitled "Psychic helped pick Myers jury: assisted Greene Prosecutors." In the article Hulsey notes that Prosecutor Schenck used a psychic named Karyol K. to assist him in picking suitable jurors. Myers' attorney William Summers was quoted in the article "As long as they don't want her (Karyol K.) to testify, I could care less." Assistant Prosecutor Stephen Wolaver was quoted as saying Karyol didn't produce any outstanding revelations and basically corroborated the prosecutor's team's opinions.
In her affidavit (Ex. N) Kelly Heiby, an investigator for the Ohio Public Defender, stated that Delores Hamilton, the former spouse of Greg Grimes, informed her that the psychic told her that "her husband didn't kill Amanda Maher."
The State argued this claim should be dismissed because Myers cited no case law prohibiting it from using a psychic in the manner assisted.
The trial court found that Myers had failed to present any law which prevented the State's use of a psychic and failed to prevent any reason for not raising this claim on direct appeal.
It is clear that Myers knew that the State had used a psychic to assist in the selection of the jury. He was therefore duty bound to raise any objection to that procedure in the trial court. Any claim that trial counsel was ineffective for failing to object to the psychic's use during voir dire should have been raised in the direct appeal.
Myers presented no supporting material that indicated that the State used the psychic to alter or influence any of the State's witnesses. Lastly, there was no evidence offered to support the claim that the psychic influenced the prosecutor's decision to seek an indictment against Mr. Myers. The trial court properly rejected this claim as well.
In Myers' thirty-second, thirty-fourth, and thirty-sixth claims he asserted that the cumulative effect of the errors and omissions as presented in his petition denied him rights secured by the Fourth, Fifth,Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 9, 10, and 16 of the Ohio Constitution. Again the State asserted that these claims were barred by the defense of res judicata. The trial court agreed with the State and overruled these claims as well. We agree with the trial court's resolution of these claims.
In his thirty-third claim, Myers claims his convictions should be vacated because Ohio does not provide an adequate corrective process to consider post-conviction claims in violation of the Eighth andFourteenth Amendments of the U.S. Constitution.
The State asserted that this claim was barred by the defense of res judicata. The trial court found that Myers had failed to present any evidence that would support this allegation to warrant a hearing on relief.
The Supreme Court has held that states have no constitutional obligation to provide post-conviction remedies. Pennsylvania v. Finley (1987), 481 U.S. 551. The Ohio Supreme Court has also held that state collateral review is not a constitutional right, State v. Steffen (1994), 70 Ohio St.3d 399, and the petitioner receives no more rights than those granted by the post-conviction statute. State v. Calhoun (1999), 86 Ohio St.3d 279. The trial court properly denied this claim as well.
In his thirty-fifth claim, Myers contended the death penalty imposed upon him violated the Eighth Amendment's prohibition against cruel and unusual punishment because he will have to spend years on death row. The State asserted the defense of res judicata which the trial court adopted in rejecting this claim. We agree this claim could have been asserted in the direct appeal as it is well known that death row prisoners spend many years on death row before appeals and collateral proceedings are exhausted. The trial court properly denied this claim as barred by the defense of res judicata.
As part of this assignment of error, Myers alleges that the trial court erred by not allowing him to conduct discovery before denying his petition. Although Myers claims post-conviction relief is a civil proceeding, he is only partially correct. More accurately, it is a special statutory proceeding that is quasi-civil in nature. See State v. Nichols (1984), 11 Ohio St.3d 40, 41-42; State v. Kinley (1999), 136 Ohio App.3d 1,20-21. "Civ.R. 1(C) provides that the civil rules, `to the extent that they would by their nature be clearly inapplicable, shall not apply to procedure * * * in all other special statutory proceedings.'" Kinley, supra. R.C. 2953.21 governs post-conviction proceedings and does not state that the civil rules apply. Consequently, we have held that a post-conviction relief petitioner is not entitled to the discovery provided for in the civil rules. Kinley, supra, citing State v. Chinn (Aug. 21, 1998), Montgomery App. No. 16764, unreported. Notably, the Supreme Court of Ohio has also found that civil discovery is not required in post-conviction proceedings. State ex rel. Love v. Cuyahoga Cty. Prosecutor's Office (1999), 87 Ohio St.3d 158,159.
Myers additionally argues that he should have been allowed access to expert assistance in preparing his post-conviction relief petition. We have previously allowed expert testimony at a post-conviction relief hearing to determine whether trial counsel was ineffective at trial. See State v. Chinn (Aug. 21, 1998), Montgomery App. No. 16764, unreported. However, in that case, Chinn submitted affidavits from expert witnesses he felt should have been called at trial. Based on those affidavits, we held that the experts should have been permitted to testify at an evidentiary hearing. Id., at p. 4. In the present case, it is not clear from the brief what type of expert Myers wishes to utilize or for what purpose. Myers argues that experts are permitted in federal habeas corpus proceedings, and therefore should be permitted in post-conviction proceedings. He cites no authority or factual support for this proposition.
The use of experts is provided for in the civil rules as part of discovery. See Civ.R. 26(B)(4). For the same reasons as stated above, Myers would also not be entitled to expert assistance. Accordingly, the trial court did not err by not allowing Myers to conduct discovery, including the use of experts, for his petition. The fifth assignment of error is also overruled.
The judgment of the trial court is affirmed.
FAIN, J., and GRADY, J., concur.